WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sr. Ozzy's Franchising LLC, et al., | No. CV-23-00238-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Jissel Morales, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' SR Ozzy's LLC and Sr. Ozzy's Franchising LLC's (collectively, "Sr. Ozzy's") Motion for Preliminary Injunction/Motion for Temporary Restraining Order (Doc. 17). For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

In 2017, Osiel and Diana Perez started Sr. Ozzy's Tacos y Mariscos, an authentic Mexican restaurant. Because of Mr. and Mrs. Perez's efforts, Sr. Ozzy's became commercially successful. So much so that in 2021, Mr. and Mrs. Perez pursued franchising. They "spent over one hundred thousand dollars on the franchising process, including with a franchise development company, lawyers, accountings, sales representatives, and the like." (Doc. 17 at 2.) Since 2021, they have sold six franchises, including three in Arizona and three in other states.

Defendant is a limited liability corporation, SR Ozzy's Bar & Grill LLC.[1]  On May 25, 2022, the parties entered a Franchise Agreement intending that Defendant would open a Sr. Ozzy's restaurant at 19401 N. Cave Creek Road, #15-17, Phoenix, Arizona 85025. As part of their franchising business, Sr. Ozzy's trains its franchisees through initial and ongoing training, support, and general guidance as they begin their businesses.  Defendants started their initial training in August 2022.  At this training, Defendants were given access to Sr. Ozzy's Operations Manual ("Manual"), which contains proprietary information like Sr. Ozzy's recipes and business practices.  For several months, Sr. Ozzy's assisted Defendants as they prepared to open their restaurant.  In November 2022, however, Defendants stopped communicating with Plaintiffs.

Plaintiffs present at least some evidence to believe that Defendants still intend to open a Sr. Ozzy's restaurant.  They have provided photographic evidence of Sr. Ozzy's signage at the location where the parties agreed that Defendants would open their franchise, which uses the Sr. Ozzy's name.  Plaintiffs have also testified that they have seen advertisements of an unspecified date soliciting employees for the enterprise. (Doc. 1 at 5.)

On January 25, 2023, Plaintiffs notified the Defendants in writing of the immediate termination of their Franchise Agreement.  (*See* Doc. 1-3 at 43 (noting Plaintiffs' ability to terminate the Agreement at their option, effective five days after written notice is provided.).)   The Notice of Termination reiterated Defendants' post-termination obligations under the Franchise Agreement.  Since then, Defendants have not communicated with Plaintiffs, and, according to Plaintiffs, Defendants have "continued to operate the formerly-franchised restaurant, have continued to improperly use the Sr. Ozzy's Mark and Sr. Ozzy's name without authorization, and have continued to improperly hold themselves out to the public as a licensee of the Sr. Ozzy's Mark and part of the Sr. Ozzy's System." (Doc. 1 at 6.)  Thus, Plaintiffs brought this motion for a preliminary injunction to enjoin such conduct, alleging that Defendants are violating federal trademark laws,

---

[1] Plaintiffs have served SR Ozzy's Bar & Grill LLC.  They seek alternative service as to other individual members of the LLC and/or those involved in operating the restaurant.

breaching their Franchise Agreement, and misappropriating trade secrets.

## DISCUSSION

### I. Legal Standard

A plaintiff seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits of their claims, (2) they will suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities supports a preliminary injunction, and (4) an injunction is in the public interest. *Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018). This framework "creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### II. Likelihood of Success

#### A. Trademark Infringement

Plaintiffs will likely succeed on their trademark infringement claim under § 32 of the Lanham Act and their unfair competition claim under § 43 of the Act. 15 U.S.C. §§ 1114, 1125(a). "Where, as here, a plaintiff's § 43 unfair competition claim is based on alleged infringement of a registered mark, the legal analysis under the two sections is essentially identical." *Lodestar Anstalt v. Bacardi & Co.,* 31 F.4th 1228, 1245 (9th Cir.), *cert. denied*, 143 S. Ct. 428 (2022). That analysis considers "the two elements of trademark infringement, which are (1) a 'protectable [*sic*] ownership interest in the mark'; and (2) a likelihood of 'consumer confusion' in the defendant's use of its allegedly infringing mark." *Id.* (citing *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012)).

Plaintiffs own a federal registration for the "SR. OZZY'S" mark. (Doc. 18 at 5.) This registration is "admissible in evidence and []prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115

(a). Thus, Plaintiffs have established the first element of their Lanham Act claims, and the Court must consider the likelihood of confusion that will ensue if Defendants proceed with their plan to open Sr. Ozzy's Bar & Grill.

In the Ninth Circuit, courts consider the eight *Sleekcraft* factors for determining whether consumers are likely to be confused by a defendant's use of a registered mark: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). These factors are not exhaustive, and "[o]ther variables may come into play depending on the particular facts presented." *Id.*

Still, "the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Here, the marks are highly similar. "Defendants are simply using the Sr. Ozzy's Mark in its entity name and restaurant operation, and using the Mark for their competing business, only adding 'Bar & Grill' [at] the end of Sr. Ozzy's for their signage." (Doc. 18 at 5); *see also GoTo.com*, 202 F.3d at 1205 ("The greater the similarity between the two marks at issue, the greater the likelihood of confusion."); *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) ("Similarities are weighed more heavily than differences."). Thus, consumers are likely to be confused and might conflate Plaintiffs' business and Defendants' establishment.

Further, at the preliminary hearing, Plaintiffs noted the proximity of Defendants' restaurant and other Sr. Ozzy's locations and the similarity of food offerings at both businesses, which support the second and sixth *Sleekcraft* factors. More specifically, Plaintiffs noted that Defendants' restaurant is within the same metropolitan area (and a certain number of miles) of two other Sr. Ozzy's locations. And pursuant to the parties' initial Franchise Agreement, Plaintiffs provided a list of "Approved Products and Services"

and "explicit instructions for . . . specifications for goods that will be used in or sold by the Sr. Ozzy's Business." (Doc. 1-3 at 11.) Further, the ingredients will be (or might already have been) procured using Plaintiffs' vendors. Likewise, at the hearing Plaintiffs' witness supported the fourth *Sleekcraft* factor when she testified that vendors have called Plaintiffs to explain that Defendants had outstanding, unpaid bills.

Plaintiffs did not squarely address the remaining *Sleekcraft* factors in their motion or at the hearing. Nevertheless, the parties' Franchise Agreement supports the idea that Defendants' intention (seventh factor) in selecting the mark was to benefit from the credibility, training, and connections provided by Plaintiffs' franchising system. In addition, the longevity of Plaintiffs' business and expansion to several franchises tend to support the mark's strength (first factor). Accordingly, Plaintiffs have sufficiently established that consumers will likely confuse their mark and Defendants' branding to succeed on their Lanham Act claims.

### B. Breaches of Contract

In Arizona, plaintiffs can prove contract claims by showing (1) the existence of a valid contract, (2) breach, and (3) resulting damages. *First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 353, 372 P.3d 292, 297 (2016). Plaintiffs claim that Defendants breached their Franchise Agreement in several ways: by continuing to use Sr. Ozzy's trademarks upon termination or expiration of the contract, suggesting they are affiliated with Sr. Ozzy's through the use of their signage, and failing to return Sr. Ozzy's Operations Manual. Plaintiffs also claim that Defendants are currently in breach of the Agreement's two-year non-compete provision because, despite termination of the Agreement, Defendants might begin operating their restaurant within a 25-mile radius of other Sr. Ozzy's locations. Plaintiffs are likely to succeed on their first claim, but their likelihood of success on the second is unclear.

The Agreement is a valid contract. And Plaintiffs have offered enough evidence to show that Defendants breached several relevant provisions, including Sections 10.3, "Rights and Obligations After Termination or Expiration" and 8.6.2, "Post-Term

Covenants." On January 25, 2023, Plaintiffs notified Defendants that the Franchise Agreement was immediately terminated, which triggered the Agreement's post-termination obligations five days after Defendants received the Notice of Termination. Those obligations compelled Defendants to take several actions, including providing an accounting, ceasing the use of the Sr. Ozzy's mark or similar signage, removing contact information from public listings, returning the Manual, and maintaining records for a period of five years, etc. (Doc. 1-3 at 44.) Thus, Plaintiffs have sufficiently shown breach at this stage through photographic evidence that Defendants are still using their trademarked name and improperly affiliating with Sr. Ozzy's. Additionally, Ms. Perez's testimony sufficiently establishes that Defendants have not yet returned the Manual.

However, Plaintiffs have not shown that Defendants are breaching the Agreement's non-compete provision, § 1.5 "Unfair Competition After Relationship." (Doc. 1-3 at 69.) Under that provision, upon the termination of the Agreement, Defendants could not "unfairly compete" with Sr. Ozzy's by engaging "Prohibited Activities," which were defined as:

> (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing (a) any of our employees or managers (or those of our affiliates or franchisees) to leave their position or (b) any customer of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

(Doc. 1-3 at 67, 68.)

The Agreement further specified that the Prohibited Activities were forbidden for a "Restricted Period" that was defined as "the two (2) year period after you cease to be a manager of Franchisee's Sr. Ozzy's Business." (Doc. 1-3 at 68, 69.) Although Plaintiffs claim that Defendants might begin operations at any time, on the facts presented, it is not obvious that Defendants intend to do so. On the one hand, Plaintiffs' witness testified that

she drove by Defendants' restaurant and saw Sr. Ozzy's signage in recent weeks. On the other hand, she did not say that Defendants were engaged in any of the Prohibited Activities, nor did she provide persuasive evidence that suggests they are imminently preparing to engage in any of those activities.

For example, Ms. Perez also testified that she saw online job listings for open positions at Defendants' restaurant at an undefined time. It is unclear whether these postings were created before or after Plaintiffs terminated the parties' Franchise Agreement. It is also not clear whether or when Defendants began actively hiring new staff or reviewing these applications. If the Defendants created the job postings before Plaintiffs terminated the Agreement and thereafter stopped reviewing applications, then the existence of the job postings would not tend to evince the Defendants' intent to open the restaurant in violation of the non-compete provision.

Finally, Ms. Perez testified that Sr. Ozzy's has received calls from vendors complaining that Defendants have not paid their bills. Still, it is unclear whether any vendors have already supplied Defendants with ingredients or other services and supplies. If Defendants are not paying their bills and the vendors have not delivered any supplies, then the vendor calls Ms. Perez describes might not provide any evidence about the status of the restaurant or whether Defendants are engaged in any Prohibited Activities. Thus, it is unclear that Plaintiffs are likely to succeed on their breach of contract claim insofar as they seek damages under the Franchise Agreement's non-compete provision.

### C. Trade Secret Misappropriation

Under the Arizona Trade Secrets Act, a trade secret is defined as information that (a) derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of reasonable efforts to maintain its secrecy. A.R.S. § 44-401(4). Misappropriation occurs if a person discloses or uses a trade secret without consent (express or implied) when the trade secret was acquired under the circumstances giving rise to a duty to maintain its secrecy or limit its use. A.R.S. § 44-

401(2)(b)(ii).

Plaintiffs claim that Defendants' failure to return their Manual constitutes misappropriation of trade secrets within this definition. At the hearing, Ms. Perez testified that the Manual contains proprietary recipes, business strategies, and vendor contacts. According to her testimony, this information took time to develop and could harm Sr. Ozzy's if their competitors had access to the Manual because it outlines most aspects of their operations. Ms. Perez also noted that the Definition section of the Agreement expressly stated that the Manual was confidential and that franchisees should take reasonable steps to ensure it remained a secret. (*See* Doc. 1-3 at 67 ("'*Manual*' means our confidential operations manual for the operation of a Sr. Ozzy's Business")); (*See also* Doc. 1-3 at 21 ("You shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Sr. Ozzy's Business, and the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.").) Thus, Plaintiffs have sufficiently established that some parts of the Manual are trade secrets under Arizona law.

However, Plaintiffs have not shown that Defendants have disclosed or used these trade secrets in a manner that can give rise to a misappropriation claim. Although Defendants had a contractual obligation to return the Manual, Plaintiffs have not presented any affirmative evidence that shows Defendants plan to open the restaurant and use the secrets to their benefit. Likewise, Plaintiffs have not presented evidence that Defendants have disclosed the trade secrets to anyone else. Plaintiffs have offered minimal and generalized testimony that Defendants are using some of their vendors, and they have offered some minimal testimony to suggest that the suppliers of some of the ingredients in their recipes may qualify as trade secrets. But, again, they have not offered sufficient testimony to conclude that their vendors, with whom Defendants have been in contact, are the supplier(s) of the ingredients for their recipes. Thus, Plaintiffs have not yet presented sufficient evidence to conclude that they are likely to succeed on their misappropriation claim, even if their allegations might be sufficient to support their trademark infringement

claims and one of their breach of contract claims.

### III. Irreparable Harm

Next, the Court must examine whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "Irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004). "Harm that is speculative will not support injunctive relief." *Am. Trucking Ass'ns*, 559 F.3d at 1057.

Plaintiffs will be harmed by continued use of their mark because consumers may confuse Defendants' restaurant with Plaintiffs' active franchises. In addition, plaintiffs will also be harmed by Defendants' active breach of the Franchise Agreement. Although some of these harms might be difficult to quantify, many courts routinely find irreparable harm under similar circumstances. *See, e.g.*, *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011) (noting that plaintiffs would be irreparably harmed where franchisees engaged "in the unauthorized use of Wetzel's marks" because unless plaintiff was "allowed to protect its marks, its ability to control its reputation and goodwill associated with the marks will be significantly reduced"); *Morris CM Enterprises, LLC v. Wingstop Franchising, LLC*, No. 219CV02306KJMCKD, 2020 WL 42241, at *5 (E.D. Cal. Jan. 3, 2020) (noting that "Wingstop has demonstrated that Morris CM's continued use of its marks will cause it irreparable harm" because "[t]he restaurant in question continues to identify itself as a Wingstop eatery"); *IHOP Franchising, LLC v. Hameed*, No. 2:14-CV-1752-TLN-CKD, 2015 WL 429547, at *5 (E.D. Cal. Feb. 2, 2015) (same). Indeed, in trademark cases, "irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim." *Brookfield Communications, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999); *see also* 15 U.S.C 1116(a).

However, the harms related to Plaintiffs' non-compete and trade secret misappropriation claims are speculative. *See Bambu Franchising, LLC v. Nguyen*, 537 F.

Supp. 3d 1066, 1079 (N.D. Cal. 2021) (finding that violation of a non-compete constituted irreparable injury where customers were shopping at an active store and posting online reviews of its merchandise). As discussed above, Plaintiffs have not offered persuasive evidence that Defendants intend to open and operate their restaurant, nor have they offered evidence that Defendants disclosed or used the trade secrets in the Manual.

### IV.  Balance of Equities & Public Interest

To receive a preliminary injunction, "movants must show that the balance of equities tips in their favor" and "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Miracle v. Hobbs*, 427 F. Supp. 3d 1150, 1164 (D. Ariz. 2019), *aff'd,* 808 F. App'x 470 (9th Cir. 2020) (noting that the court considers these inquiries in tandem). Case law supports Plaintiffs' position that "Defendants will not be irreparably harmed by a preliminary injunction as the injunction will only compel Defendants to comply with its contractual obligations." (Doc.s 18 at 10.)

Indeed, sufficient legal authority supports "the proposition that a preliminary injunction is in the public interest, namely, that the terms of a valid contract should be enforced against the parties to the contract." *Massage Envy Franchising LLC v. Goat Rodeo Ventures LLC*, No. CV-18-01998-PHX-JJT, 2018 WL 4148912, at *2 (D. Ariz. Aug. 30, 2018) (citing *Rebath LLC v. New England Bath Inc.*, No. CV-16-01700-PHX-DLR, 2016 WL 8670165, at *6 (D. Ariz. July 15, 2016) ("It is generally in the public interest to enforce valid contracts and make parties live up to their agreements.") (internal quotations omitted); *see also Armored Grp., LLC v. Supreme Corp.*, No. CV-09-00414-PHX-NVW, 2010 WL 3940459, at *6 (D. Ariz. Oct. 6, 2010) ("Arizona law favors [contract] enforcement when it is clear that the parties intended themselves to be bound.") (internal quotations omitted).

### CONCLUSION

Accordingly, because Plaintiffs have met all of the elements required to obtain a preliminary injunction on some of their claims, the Court will enter the requested relief to the extent described below.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 17) is **GRANTED** in part and **DENIED** in part:

1. It is granted as to Plaintiffs' trademark infringement claims;
2. It is also granted as to Plaintiffs' breach of contract claims to the extent that those claims are not based on the non-compete provision;
3. It is denied without prejudice as to Plaintiffs' trade secret misappropriation claim.

**IT IS FURTHER ORDERED** that Defendants and their agents must immediately discontinue the use of the Plaintiffs' marks or any similar service marks in connection with any business.

**IT IS FURTHER ORDERED** that Defendants and their agents must immediately perform their post-termination obligations as they are defined in 10.3(a)–(k) of the Franchise Agreement.

**IT IS FURTHER ORDERED** that this Preliminary Injunction shall remain in effect until the trial of this matter, or two years from the entry of this order or Defendants' compliance with same, whichever is later.

**IT IS FURTHER ORDERED** that because Defendants agreed to waive the bond required pursuant to Section 11.10 of the Franchise Agreement, Plaintiffs are not required to post a bond pursuant to Fed. R. Civ. P. 65(c).

**IT IS FURTHER ORDERED** that this order is only effective as to served Defendants and their agents. Unless Defendants are represented by counsel known to Plaintiffs, Plaintiffs shall serve copies of Plaintiffs' Motion and this Order on each currently unserved Defendant, via electronic mail and overnight mail, at the following address:

> Jissel Morales
> Firmen Morales
> Martha Patricia Morales
> 4659 N. 101st Avenue
> Phoenix, Arizona 85037

If Defendants are represented by counsel known to Plaintiffs, Plaintiffs may serve

Plaintiffs' Motion and this Order upon counsel, via electronic mail and overnight mail. Plaintiffs shall continue to provide notice of these proceedings and copies of the documents on file in this matter to Defendants (directly or through counsel, as appropriate) by such means reasonably calculated to give notice which is permitted by the Court.

**IT IS FURTHER ORDERED** that to the extent Plaintiffs seek a temporary restraining order, their motion is denied as moot in light of the foregoing relief.

Dated this 22nd day of March, 2023.

_____
G. Murray Snow
Chief United States District Judge